## THOMPSON et al. v. BRADFORD MOTOR FREIGHT LINE et al.*

### No. 14515.

Court of Appeal of Louisiana. Orleans.

May 8, 1933.

Rehearing Denied May 22, 1933.

Wm. A. Green, of New Orleans, for appellants.

Clarence De Lucas, of New Orleans, for appellees.

WESTERFIELD, Judge.

This is a suit under the Compensation Law (Act No. 20 of 1914, as amended). Estelle Thompson and Joseph Dugas, divorced parents of Vernal Dugas, who died on January 2, 1932, bring this suit against the Bradford Motor Freight Line, an ordinary partnership composed of Oliver F.; William M., and Ione H. Bradford, and the individual members thereof, claiming compensation at the rate of $3.90 per week each for 300 weeks for the death of their son, which, it is alleged, occurred in the course of and arose out of his employment.

The defense is, as stated in counsel's brief:

"a. That at the time of the accident Vernal Dugas was not an employee.

"b. That if he was an employee, then the accident did not arise out of, nor in the course of his employment.

"c. That if he was an employee and if the accident did arise out of and in the course of his employment, your respondents are still not liable because said employee's death was due to his wilful intention to injure himself.

"d. That if he was an employee and if the accident did arise out of and in the course of his employment and if his death was not due to his wilful intention to injure himself, then your respondents are still not liable because employee's death was due to his deliberate failure to use an adequate guard or protection against accident provided for him."

There was judgment below in defendants' favor dismissing plaintiffs' suit, and plaintiffs have appealed.

The defendant conducts a motor freight line between New Orleans and Plaquemine, La. Vernal Dugas, who lived on the route of the freight line in Donaldsonville, La., was employed as a driver's helper, his business

*Writ of certiorari denied July 7, 1933.

being to assist the chauffeur in loading and unloading freight on the truck. On the morning of January 2, 1932, Albert Martinez, the chauffeur, and Vernal Dugas, his helper, arrived in New Orleans about 11 o'clock a. m. from Plaquemine, returning from one of their trips to that section. They received their weekly wages at about 4:30 p. m., and, as there was no freight for the return trip, their truck was laid up in New Orleans, but another truck of the same line was going back to Plaquemine and through Donaldsonville, and Dugas and Martinez, who also lived in Donaldsonville, boarded this truck, which was in charge of Huit Gomez and Isiah Pinkins, as chauffeur and helper respectively, with the intention of riding to their homes. Gomez, Pinkins, and Martinez occupied the driver's seat and Dugas was seated on the gas tank, a position, according to the testimony, involving some peril, but which he refused to give up and get in the trailer, which was attached to the truck, notwithstanding repeated advice to do so on the part of the other occupants of the truck. After the truck had reached a point about twenty miles out of New Orleans and near the town of Norco, it struck a rut, with the result that Dugas was dislodged from his position on the gas tank, thrown to the road, and rolled over and killed, or, more accurately speaking, died a few hours later.

■ The first defense, to the effect that Dugas was not an employee at the time of his injury and death, is based upon the statement of his employers to the effect that he was employed only from day to day, the argument being that each day's employment amounted to a separate contract of hiring, and, consequently, the accident having happened at the close of his day's work, he was not an employee.

This contention is without force. Whether he was paid by the day or by the week or by the month, he was in their employ and had been for several months prior to the accident.

■ The second defense, to the effect that the accident did not arise out of or in the course of the employment, is not so easily disposed of. As will be recalled, the accident happened at the end of the day's work and while the employee was on his way to his home. As a rule the relation of master and servant terminates when the servant leaves the place of employment at the close of the day's work to go to his home, and an injury suffered in going to and returning from work is generally regarded as one not arising out of the employment. Bass v. Shreveport-Eldorado Pipe Line Co., 4 La. App. 107, and authorities there cited. But, where an employee is furnished transportation by the employer as an incident to his employment and is injured either while coming to or returning from work, the injury is said to have arisen out of his employment. Nesbitt v. Twin City Forge & Foundry Co., 145 Minn. 286, 177 N. W. 131, 10 A. L. R. 169; 21 A. L. R. 1223, note. Was the transportation furnished Dugas by his employer an incident to his employment?

It is admitted that on the fatal trip Dugas had boarded defendants' truck with their permission and, the record shows, in defendant William Bradford's presence. The record also shows that it was the custom to permit Dugas and other employees to ride home on trucks of the defendant company under similar circumstances. In other words, when there was no freight for the truck which they had driven into New Orleans to take back, employees were permitted to ride home on any other truck of defendants which happened to be going in the direction of their homes. There is no dispute as to this custom, but the legal effect of it is in controversy; plaintiffs contending that it amounted to an implied agreement as an incident to employment, and defendants contending that it was simply a convenience or gratuity offered by the defendants to their employees.

In the case of May v. Louisiana Central Lumber Co., 6 La. App. 748, an employee of a lumber company was injured in attempting to alight from a moving train which was operated by his employer as a convenience for its workmen in going to and from their work. There was no agreement to supply transportation and it was doubtful whether it was more convenient for the particular employee who was injured to use the train or to walk home, for, whether he used the train or not, the distance he would have had to walk would have been approximately the same. The defendant in that case insisted that the accident did not arise out of the employment and that the plaintiff was a mere licensee on its train and that his injury was due to his deliberate act in attempting to leave it while in motion. The court, however, held that plaintiff could recover because, whether there had been any express agreement or not, the transportation which had been furnished by the employer was incidental to the employment, citing In re Donovan, 217 Mass. 76, 104 N. E. 431, Ann. Cas. 1915C, 778, Bass v. Shreveport-Eldorado Pipe Line Co., 4 La. App. 109. The facts in the May Case are strikingly similar to those which obtain here, with the distinction that, in the instant case, the convenience of the transportation supplied by the master is more obvious because the saving here in the cost of transportation is complete, whereas, in the May Case, the difference between using the transportation and not using it resulted in no saving in the amount of distance to be walked. Besides, the defendant in this case has convinced us that the deceased was paid $6 a week for his labor and not $12, as contended for by plaintiffs. It seems, therefore, that with this small pay there must have been some other inducement to the employee,

a resident of Donaldsonville, to accept employment on a truck line which carried him so far from home and often left him stranded without means of return transportation. He could hardly have maintained himself and paid for transportation on so small a salary.

We are aware that there is much respectable authority to the contrary. Erickson v. St. Paul City Ry. Co., 141 Minn. 166, 169 N. W. 532; Kowalek v. N. Y. Consol. Ry. Co., 229 N. Y. 489, 128 N. E. 888; Kirby Lumber Co. v. Scurlock (Tex. Civ. App.) 229 S. W. 975. We are convinced that the present case, however, cannot be distinguished in principle from May v. Louisiana Central Lumber Co., decided by our brothers of the Second Circuit, and we have concluded to follow them. But, were we in doubt, the fact that our Supreme Court has several times admonished us concerning a tendency to place too narrow a construction upon the compensation statute would be sufficient to overcome any indecision on our part. In Dyer v. Rapides Lumber Co., 154 La. 1091, 98 So. 677, 678, a case arising in the Second Circuit, the Supreme Court remarked:

"We think the Court of Appeal has placed too narrow a construction on the terms of the statute requiring that the accident should arise out of the employment."

But Plick v. Toye Bros. Auto & Taxicab Co., 169 La. 44, 124 So. 140, and Kern v. Southport Mill, Ltd., 174 La. 432, 141 So. 19, 21, are cases in which this court was reversed because of its narrow views of this clause. In the last-cited case, that of Kern v. Southport, Mill, Ltd., we held that an injury to an employee, while on his way to work, due to his being knocked down by an automobile on a public street, did not arise out of his employment notwithstanding the fact that the scene of the accident was in front of the employer's place of business, on the ground that he was no more subjected to such injury by reason of his employment than he would otherwise be, the propinquity of the scene of the accident not being regarded by us as of importance (19 La. App. 338, 136 So. 225). The Supreme Court, however, held that the question of whether an employee "might have been injured in the same way, and even at the same place and time had he not been called there by the necessities of his employer's business, but had gone there only for his own pleasure or in pursuit of his own business, has nothing whatever to do with the case. It was his employer's business which called him to the place and time of the accident and not his own pleasure or business; and hence his injuries arose out of his pursuit of his employer's business and not out of his pursuit of his own business or pleasure."

A proper respect for the opinion of our brethren of the Supreme Court requires the subordination of our former views on the subject of injuries arising out of an employer's business and results in the conclusion that the plaintiff in this case must recover.

■ With reference to the remaining defenses, to the effect that Dugas' death was due to his intentional injury of himself and his failure to use an adequate guard against accident, we find no merit in them whatever. If Dugas was disobedient in riding on the gas tank instead of on the trailer attached to the truck, as he was advised to do, his disobedience would not bar his recovery (Plick v. Toye Bros. Auto & Taxicab Co., 13 La. App. 525, 127 So. 59), and we know of no guard supplied by his employer which would have protected him against accident.

The amount of compensation to be allowed must be computed upon a basis of $6 a week and not $12, as plaintiffs have claimed. Plaintiffs are entitled to the sum of $1.95 per week, or one-half of 65 per cent. of $6 each, for 300 weeks.

For the reasons assigned it is ordered, adjudged, and decreed that the judgment appealed from be reversed, and it is now ordered that there be judgment in favor of the plaintiffs, Estelle Thompson (divorced wife of Joseph Dugas) and Joseph Dugas, and against the ordinary partnership, the Bradford Motor Freight Line, and each of the individual members thereof, Oliver F. Bradford, William M. Bradford, and Ione H. Bradford, jointly and severally, as compensation for the death of plaintiffs' son, Vernal Dugas, in the sum of $1.95 per week each for a period of 300 weeks, commencing January 2, 1932, with legal interest on each installment from its due date until paid, and with costs of both courts.

Reversed.

JANVIER, Judge (dissenting).

In the case at bar, the plaintiff's work was finished for the week and he had been paid off; he was on his way home when the accident happened, and was more than a mile from defendant's premises. He was entirely out of his employer's control and was not where he was performing or where he could perform any service for his employer; he was riding on a conveyance not used to carry him as an incident of his employment or as part of his compensation, but he was permitted to ride on it as a matter of accommodation; he was not on his way to living or boarding quarters furnished or controlled by the employer as an incident of his employment or part of his compensation; he was on his way to his own home. Under such circumstances, the accident did not arise out of or in the course of plaintiff's employment nor was it an incident thereto, and therefore he is not entitled to recover.

The above paragraph is taken verbatim, without the change of a single word or a single punctuation mark, from the opinion written by Mr. Justice Odom, then judge of the

Court of Appeal for the Second Circuit, in the matter of Bass v. Shreveport-Eldorado Pipe Line Co., 4 La. App. 107. I have set it forth, not as a quotation from that opinion, but as a statement of fact in the case now before us, because the facts in this case are exactly as were those set forth in the above paragraph. If the decision in that case was correct, then the prevailing opinion in the case before us now is incorrect. The two cannot be reconciled. Under the prevailing opinion the death of young Dugas resulted from an accident which arose out of his employment.

There is in the record no evidence whatever to the effect that the employers contracted to furnish transportation to their employees or that it was a necessary incident to the contract of employment. On the contrary, the testimony given by every witness who mentioned the subject of transportation was to the effect that no such transportation was contracted for, referred to, or necessarily implied from the terms of employment. They all stated that it was only where by good fortune a truck happened to be going in the direction in which an employee desired to go, that such employee, purely as a gratuity and not in any way as an obligation of the employer, was permitted to ride on that truck. This had no more to do with the employment than had the employee been fortunate enough to obtain a ride with some total stranger.

My associates base their conclusion that the accident arose out of the employment largely on the views expressed by our brothers of the Second Circuit in May v. La. Central Lumber Company, 6 La. App. 748, in which, as I find it stated in the majority opinion, "an employee of a lumber company was injured in attempting to alight from a moving train *which was operated by his employer as a convenience for its workmen in going to and from their work.*" (Italics mine.)

I believe that the words which I have italicized show the distinction between that case and this. There, as my associates find, the train was operated by the employer as a convenience to the employees. In other words, it was intentionally furnished and regularly run each day in order that they might ride. Special coaches were hauled. In such case it was, of course, proper to say that these facts indicated clearly that transportation was intentionally and deliberately furnished as an incident to the contract of employment. No such conditions existed in this case, and it was only when, purely by chance, an employee was so fortunate as to find a truck going in his direction that he was afforded transportation.

I do not see that the decision of the Supreme Court in Kern v. Southport Mill, Ltd., 174 La. 432, 141 So. 19, 20, is to any extent controlling here, for, according to the facts as the Supreme Court found them in that case, that matter may be easily distinguished from this.

I quote from that opinion:

"Plaintiff was employed by defendant. * * * He was directed to do some outside work and then return to the mill. On returning he stepped out of a street car into the path of an automobile; was struck down, and permanently and totally injured; and now claims compensation."

If Kern's employers sent him out on a job and ordered him to return when the job was finished, certainly he was within the protection of the compensation statute while going from the regular place of employment to the outside job and while returning from that job to the regular place of employment. There is no similarity, in my opinion, between the facts of that case and the facts of this one.

The facts in this case, in my judgment, bring it squarely within the doctrine announced in many cases, of which I cite, as typical examples, Bass v. Shreveport-Eldorado Pipe Line Company, supra; Erickson v. St. Paul City Railway Company, 141 Minn. 166, 169 N. W. 532, 533; Kowalek v. New York Consolidated Railway Company, 229 N. Y. 489, 128 N. E. 888, and Milner v. Louisiana Highway Commission, 17 La. App. 28, 134 So. 441.

The facts in the Bass Case are set forth in the opening paragraph of this dissenting opinion and need not be repeated here.

In the Erickson Case, "the accident happened after the employees had completed their day's work and had left their place of employment and while they were proceeding toward their respective homes. Although they were riding on the truck of their employer, it clearly appears that their contract of employment imposed no obligations upon the employer to transport them to or from the place of work, and that they were merely riding as licensees to serve their own convenience. Their service for the day had terminated; they had left the place where such service had been performed and were no longer engaged in performing any service for their employer. Under such circumstances they were not within the provisions of the Compensation Law and the trial court ruled correctly."

In the Kowalek Case, "it was the practice of the company to permit employees to ride to and from their work upon the cars or trains of the company without charge." The accident occurred while the employee was being transported to his home under the above circumstances. The court said:

"The statute is not applicable to an injury which arises through a danger or hazard dissociated from or not inherent in the nature of the employment as its source and to which the employee would have been equally exposed apart from the employment. This con-

clusion is not affected by the fact that the employee would not, except for the employment, have been where such danger or hazard existed. An injury does not arise out of the employment unless the hazard causing it is, within rational apprehension, an attribute of or peculiar to the specific duties of the employment. The fact that the contract of employment exists and necessitates the acts of performance may or will occasion for the employee risks not reasonably incidental to the character of the work or employment. For the injuries caused by or flowing from those risks the statute does not direct or permit compensation. Myers v. Louisiana Ry. & Nav. Co., 140 La. 937, 74 So. 256; Hewitt's Case, 225 Mass. 1, 113 N. E. 572, L. R. A. 1917B, 249; Donahue's Case, 226 Mass. 595, 116 N. E. 226, L. R. A. 1918A, 215; Fumiciello's Case, 219 Mass. 488, 107 N. E. 349; Ross v. John Hancock Mutual Life Ins. Co., 222 Mass. 560, 111 N. E. 390; McNicol's Case, 215 Mass. 497, 102 N. E. 697, L. R. A. 1916A, 306; Matter of Heitz v. Ruppert, 218 N. Y. 148, 152, 112 N. E. 750, L. R. A. 1917A, 344; Matter of DeVoe v. New York State Railways, 218 N. Y. 318, 113 N. E. 256, L. R. A. 1917A, 250; Dennis v. White & Co., 1917, A. C. 479; Williams v. Sir C. G. A. Smith, 6 Butterworth's W. C. C. 102; Thier v. Widdifield, 210 Mich. 355, 178 N. W. 16; Griffith v. Cole Bros., 183 Iowa, 415, 165 N. W. 577, L. R. A. 1918F, 923. The death in the case at bar did not result from an injury arising either out of the employment or in the course of the employment."

In the Milner Case, Milner was an employee of the Louisiana State Highway Commission. He was furnished an automobile for use in his work as an inspector. He obtained permission from his superior to drive to his home to spend the weekend, intending to return to work on the following Monday. While driving to his home an accident occurred and he died as a result. The Court of Appeal for the First Circuit said:

"He was at the time driving the automobile furnished him by the Louisiana highway commission for the purpose of going from point to point in doing the inspection work which he was employed to do. But in using it to go home, his use was that of a licensee. He had no right to go home for the week-end, except by the leave of the Louisiana highway commission. In going home, he was traveling on the time of the commission, with the commission's consent previously obtained. In using the automobile for the purpose of going to Monroe, however, it was not being used for the purpose of making an inspection. In going home for the week-end, the trip was not for the performance of any service arising out of and incidental to his inspection work, but in order to visit his family—his private affair. The fact that he was being paid by the month, and that while making the trip and spending the week-end, his wage was going on, did not make the trip the performance of service arising out of and incidental to his employment."

I am of the opinion that the accident in the case before us did not arise out of the employment and that, therefore, there should be no recovery. The facts of the case and the law applicable and the reasons for the views which I hold are all so well expressed in the opinion rendered by the district judge that I deem it advisable to set forth that opinion in full:

"The court is obliged to decide cases according to the evidence presented, and where witnesses sworn testify to a state of facts, and the court has no reason to believe that they are either consciously or unconsciously committing perjury, the court has to take such testimony as the facts established in the case. Now, the testimony shows that this defendant corporation is engaged in the business of transporting freight by means of trucks from one point in the state to another, and that one of the highway lines that they use, or did use at the time of this accident, was that extending from New Orleans as far as Plaquemine. The principal source of their freight business originated in New Orleans, and two trucks, as I understood the evidence, did the business between New Orleans and Plaquemine. The crew of a truck was composed of a driver, or chauffeur, and a helper, the helper's work being to assist the truck driver in loading and unloading the truck of the freight transported by it. One of these trucks was a Chevrolet truck, the chauffeur of which was a man named Huit Gomez and the helper of which, at the time of the accident, was the deceased, Vernal Dugas. I gathered from the evidence that Gomez and Dugas both lived in Donaldsonville, that on the Friday preceding the Saturday on which the accident occurred, this truck, the Chevrolet with these two men on it, had made the trip from New Orleans to Plaquemine and delivered freight. I understand that on Friday evening preceding the Saturday of the accident, the truck, empty, having discharged the last of its freight in Plaquemine, came down to Donaldsonville, and with the intention of resuming the trip back to New Orleans empty on Saturday morning, Dugas, the deceased, was aroused from his bed at four-thirty and, together with the chauffeur, took the ferryboat across the Mississippi River at Donaldsonville and the truck was driven on down here to New Orleans, arriving about noon.

"The evidence of the two Bradfords who testified and of their employees who testified was that the chauffeur, the driver, was employed by the week, at a wage, as I understand it, of $13 a week, irrespective of time made. All the evidence of these witnesses is that the helper, being nothing but absolutely unskilled labor, was employed at a dollar a

day for every day that he worked during the week and that Saturday was the pay-day. The testimony then is that there was no freight in New Orleans which required that the Chevrolet, with the driver and Dugas, should go out of New Orleans, but that there was freight for the International Truck. The testimony is that between four and five o'clock that evening the employees of the corporation were paid off, and that the chauffeur of the Chevrolet truck and Dugas were paid, that he had made $6 that week and was paid for six days at a dollar a day, or $6.

"Now, if it was part of the usual manner of carrying on the business that the employer, at the end of the day, transported the employees back to their homes as an incident of the employment and Dugas was being, under that system and implied contract, transported back to Donaldsonville, my appreciation of the jurisdiction is that, having 'been killed while being so transported in accordance with the custom of carrying on the business and therefore as an incident of the business, his death would be regarded as having occurred in the course of or arising out of his employment; but right there comes the overwhelming and unanimous testimony of the Bradfords and of their other employees who were sworn in this case, one of them being the driver of the Chevrolet truck. Their testimony was unanimous that there was no such custom, no such agreement, no such incident of the transportation business. Their testimony was that, if a truck was going out of New Orleans, it was the custom of the Bradfords, as a mere matter of indulgence and good will—charity, perhaps, if the word can be used—to permit any of their employees who desired to go to Donaldsonville or Plaquemine or any of the other towns to ride on the freight trucks, but they testified unanimously that when no truck was going and they could not take advantage of this good will offering, they took either the bus line or the railroad trains, at their own expense, and went to their homes. Not one of the employees claimed that they had any right to ride on the truck—that it was a mere permission or indulgence. If the contrary were true and the Bradfords had no truck to transport these people, they would have been obliged to furnish them with bus fare or railroad fare, and there is no intimation that any such thing was ever done, and the circumstances they all testified to were that numbers of them took the bus or the train in order to go home.

"Now the testimony is that the drivers were employed by the week, at a weekly salary; the testimony is that the helpers were simply taken on when a truck was ready to leave with its load and that a helper's pay began with his going on the truck and that when the voyage, if I may say—or 'trip' would be a better word—was made and there was no

further need for the helper, that he was not in the employ.

"Therefore, there are two elements to consider in this case. The first is, was Dugas an employee of the Bradfords after he had been paid off and could or could not go back to work as he saw fit, without any breach of contract. If that question be answered in the negative, that he was not an employee, the case is at an end. Equally, if, under my understanding of the jurisprudence, they were under no obligation whatsoever to send any employee home and it was a matter of indifference to them whether the employee stayed in New Orleans or went somewhere else, and that they simply permitted the riding on the loaded truck as an indulgence, as a railroad might permit some persons to ride on a freight train, then his death did not occur in the course of nor did it arise out of his employment. When we take the history and philosophy of the Compensation Law, that would appear to me to be logical. The history of the Compensation Law is short and simple. Up to the time that Watt discovered the properties of steam and the steam engine arose in England and thence spread throughout the civilized world, and the day of the master and journeyman passed and the day of industrialism arrived, when machines were non-existent and the manufacturing and industry which served the world were carried on by a master, a few journeymen and apprentices, no question ever arose such as subsequently arose during the industrial age which followed Watt's invention of the steam engine. And what was that gradual realization, if I may so call it, of a fact? The thinkers, philosophers and economists of the world were struck with this phenomenon,—that practically all of the manufacturing by which articles constituting the wealth of the world and desired by and used and consumed by the people of the world were made was conducted in plants by machines, these machines being attended by human beings. Many of the machines attended by one man turned out as much product as a hundred men where the unit of production was the man. They found that, in the course of manufacture, inevitably some of these man-made machines were injured or destroyed, and they found that in the cost sheets on which the price of the article was based, the average injury and destruction of man-made machines entered and the cost of the article was increased to that extent. But what struck them was that there was a human machine still in use in these plants and factories, and they were struck by the fact that as inevitably as the man-made machine was injured and destroyed, so was the human machine injured and destroyed, and they saw and were confronted with the fact that, unless the injured employee, if he survived, or his dependents in the case of his death, could prove that he came to his

injury or death through the fault of his employer, no recovery could be had, and the thought arose, and justly arose, first in Germany as I understand, that just as the damage and destruction of man-made machines was worked into the cost sheets and paid finally by the consuming public, there was no reason why the inevitable damage and destruction that occurred to the human machine should not likewise go into the cost sheets, be reflected in the price of the articles and eventually paid by the consuming public; and the Compensation Law, first arising in Germany and then proceeding westward until it covered practically the whole civilized world, is based solely on that,—that whereas the public, which consumes the article, paid for the damage and destruction of the man-made machine, it should pay for the damage and destruction of the human machine. In the end, we all know that the ultimate consumer pays all costs, and while the employer primarily pays directly or pays by means of premiums paid to insurance companies, whether he pays directly or whether he pays in premiums, the amount paid goes into his cost sheets and is reflected in the price of the article and in the end the consuming public pays it, just like the taxes imposed upon a rented house, the landlord pays primarily and thinks he is paying taxes, but, as a matter of fact, it is reflected in his rent and the tenant is the real payer of taxes.

"Now, the idea predominating this law and flowing through it is that the risk incurred, the damage done to the human machine, incidental to, arising out of or in the course of his employment, should not be borne by him but by the consuming public, but it was never the intention, as I understand it, of the law to go beyond that and to make the consuming public or the world insurers of employees. It was only to make the consuming public pay the damage that arose in the course of manufacturing articles and providing services.

"So, therefore, in this case, if the return of these people to their homes after their work was done was not a risk arising out of or in the course of their employment but a risk that they ran in common with all of the human beings in the world, then it was not the intention of the law that the damage or destruction caused to them under such circumstances, not directly arising out of or caused by the employment, should be met, first, by the employer, and afterwards, in the course of incidence, by the consuming public.

"The evidence in this case convinces me that the death of Dugas was not one incident to his employment in a transportation service. I do not think the plaintiffs' case is made out, and there will be judgment for the defendant."

I thoroughly agree with Judge Cage in the views expressed and, since the prevailing opinion disagrees therewith,

I respectfully dissent.